### 42891. COCHRAN v. THE STATE.
(344 SE2d 402)

PER CURIAM.
Henry Lee Cochran was convicted of the murder of his wife Essie Mae Cochran, who was found beaten and stabbed to death a day after Cochran escaped from the Mitchell County Correctional Institution. He was sentenced to life imprisonment.[1] We granted Cochran's motion for an out-of-time appeal. *Cochran v. State,* 253 Ga. 10 (315 SE2d 653) (1984) and address here the enumerations of error filed by recently appointed counsel, which raise issues nearly identical to those listed by Cochran in his own brief.

1. Cochran alleges that the circumstantial evidence was insufficient to identify him as the perpetrator of the crime. The evidence showed that Cochran escaped from prison; came to his brother's house; left blood-stained clothing; and tried to wash bloodstains from his car. He then fled to Texas. The blood from his clothes and his car matched that of the victim. The evidence is sufficient to sustain the

---

[1] Cochran was convicted August 11, 1983. His notice of appeal was filed August 23, 1983, and was docketed in this court on January 12, 1984. He was granted an out-of-time appeal May 22, 1984. The out-of-time appeal was filed in superior court on October 22, 1984, and in this court on October 23, 1985. The appeal was docketed November 7, 1985, and argued on February 11, 1986.

conviction under *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Cochran alleges that he was denied effective assistance of counsel. He complains that his lawyers did not investigate thoroughly, and failed to present an alibi defense. He filed a motion before trial requesting new counsel. He complained during the trial that his lawyers were disclosing certain private information to the prosecutors. No other motion was filed on this issue prior to this appeal. The issue of ineffective assistance of counsel is usually not addressed if it is raised for the first time on appeal because the trial court has not ruled on the issue, nor is there testimony from trial counsel. *Brown v. State*, 251 Ga. 598, 600 (3) (308 SE2d 182) (1983). However, in response to Cochran's complaints about his attorneys, the trial judge stated on the record: "I know in court they're doing everything that an attorney could. In fact, they've done more than most attorneys do." Additionally, immediately after sentencing, the judge asked Cochran whether he was satisfied with the work of his attorneys; he replied that he was. Under this set of facts, the trial court ruled, albeit briefly, that Cochran was provided effective assistance of counsel. This determination is supported by the evidence. There was no error. *Weldon v. Hawkins*, 251 Ga. 188 (304 SE2d 66) (1983).

3. Cochran alleges that the trial court erred in denying his motion for funds to hire an investigator. The trial court heard argument on the motion and reserved consideration until the defense showed a necessity for such an investigation. No further request was made. There was no abuse of discretion. *Wilson v. State*, 250 Ga. 630, 634 (2) (c) (300 SE2d 640) (1983).

4. Cochran alleges that the state impermissibly placed his character in issue through evidence of prior acts and prior crimes. He objects to testimony of the smuggling of liquor into prison, and to the overruling of his motion in limine to exclude evidence of the crime of escape. The state correctly asserts that testimony concerning the confiscation of liquor, the change in Cochran's work detail as a punishment, and his subsequent escape are relevant to show a motive for the crime. There was no error. *Ingram v. State*, 253 Ga. 622, 632-634 (6) (323 SE2d 801) (1984).

5. Cochran contends that the trial court should have granted his motion for a change of venue. In his motion he referred to six newspaper articles published in September and October of 1982, nearly a year before trial. He presented testimony that "nearly everybody" knew of the crime. He also shows that 14 of the 61 veniremen were excused, although of these, only five, or 8% of the venire, were excused for prejudice. The trial court's finding that a fair trial was possible in the county in which the crime was committed has not been shown to be manifestly erroneous. *Devier v. State*, 253 Ga. 604, 609

(4) (323 SE2d 150) (1984).

6. Cochran contends that alleged juror misconduct warrants a new trial. A potential juror was observed speaking to the state's chief witness. After voir dire, the court questioned this venireman while he was under the juror's oath. The court determined that he had not discussed the case with the witness, nor was there any evidence that he had repeated the conversation to any other potential juror. The venireman was subsequently excused by the district attorney during jury selection, and did not participate in Cochran's conviction. There was no error. *Hardy v. State*, 242 Ga. 702, 704 (3) (251 SE2d 289) (1978).

7. Cochran alleges that the trial court's preliminary instructions to the jury during voir dire misled them as to the state's burden of proof. The court instructed the jury properly at the close of the trial, however. Any error was corrected satisfactorily. *Castell v. State*, 250 Ga. 776, 784 (5) (a) (301 SE2d 234) (1983).

8. Cochran alleges that the trial court erred in rejecting his challenge to the array of the grand jury. He presents the following evidence: According to the 1980 census, black citizens comprised 48.39% of the population of Mitchell County, but only 36.58% of the grand jury list, a disparity of 11.8 percentage points. Women made up 52% of the population, but only 47.36% of the grand jury list, a disparity of 4.6 percentage points. He contends that he was denied a fair trial because of this disparity, and the even greater disparity within the grand jury that indicted him, which contained but two black grand jurors.

While Cochran would have us compare the disparity in percentile points between the percentage of blacks and women in the total population and the percentage on the grand jury list, the more significant information may be derived from a comparison of grand jury composition and the age-eligible population (as persons under 18 years of age are ineligible for jury service, OCGA § 15-12-60) in determining whether there is a fairly representative cross-section of the community. OCGA § 15-12-40 (a) (1); *Devier v. State*, 250 Ga. 652 (300 SE2d 490) (1983). See also *West v. State*, 252 Ga. 156, 157, n. 1 (313 SE2d 67) (1984). Pursuant to OCGA § 24-1-4, we may take judicial notice of the 1980 Census of Population, General Population Characteristics (Georgia) for Mitchell County, Georgia, as follows: blacks constituted 42.56% of the age-qualified population and women constituted 54%. The disparity between these figures and the percentage of blacks on the grand jury list is 6 percentage points, rather than 11.8 percentage points; the disparity as to women is 7.1 percentage points, rather than 4.6 percentage points. We do not find this underrepresentation of blacks or of women so significant a disparity as requires reversal of the conviction. See *Parks v. State*, 254 Ga. 403, 408 (6) (a) (330 SE2d

686) (1985).

9. Cochran contends that the grand jury was tainted by the inclusion of an ineligible grand juror, who was over 65 years of age. Under the code section applicable at the time of Cochran's trial, one who was over 65 years of age was entitled to an exemption from jury duty. The privilege of exemption belongs to the juror and does not extend to a litigant. *Ingram v. State*, supra at 625. There was no error.

10. Cochran's contention as to the underrepresentation of young persons on the grand jury list is without merit. *Spivey v. State*, 253 Ga. 187, 198 (7) (a) (319 SE2d 420) (1984); *Payne v. State*, 233 Ga. 294, 308-9 (210 SE2d 775) (1974). But see *Parks v. State*, supra, 254 Ga. at 409.

*Judgment affirmed. All the Justices concur, except Gregory and Weltner, JJ., who concur specially, and Hunt, J., not participating.*

SMITH, Justice, concurring.

I feel compelled to voice my vigorous disagreement with Justice Weltner's special concurrence. In my opinion Justice Weltner's scheme elevates judicial economy above personal rights and that is abhorrent to me. Judicial economy should never defeat the constitutional and statutory rights of an accused.

I agree that there are certain situations in which it is appropriate to remand a case to a lower court. Such as remanding a case for a hearing to determine the voluntariness of a confession, *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964); a suppression hearing, *Waller v. Georgia*, 467 U. S. 39 (104 SC 2210, 81 LE2d 31) (1984); a hearing to supplement the record of what occurred at the trial level, *State v. Pike*, 253 Ga. 304 (320 SE2d 355) (1984) and *Dunn v. State*, 251 Ga. 731 (309 SE2d 370) (1983). But there is an enormous difference between sending a case back to a lower court for the judge to make a factual finding after an accused has been properly indicted by a properly constituted grand jury and somehow holding a void conviction in limbo until a second indictment is returned which miraculously resurrects the fallen conviction. We might as well let the government go back and get a valid warrant when a case is reversed because the warrant was insufficient, and thus cure a void conviction!

This proposal provides absolutely no incentive for the government to strive to have properly constituted grand juries. Although the scheme calls for an elaborate system to prevent the district attorney from *formally advising* the grand jury of the prior proceedings there is no way that a grand jury in Mitchell County, for example, would be unaware of the previous indictment and conviction. No matter how faithful the grand jurors may be in trying to make an impartial decision of whether or not to indict, whether to charge a greater or lesser offense, whether to charge numerous counts or a single count, and

whether it is a capital or non-capital offense, it would prove a difficult task for the strongest of personalities to argue for a no bill, lesser offense, or anything other than what they know was already decided by an earlier grand jury followed by a conviction.

When an indictment is found to be void, the issue is not whether the accused is deprived of a fair trial, the issue is whether the accused is deprived of a two-step process: 1) grand jury hearing, and 2) trial. The grand jury step of the process historically has been thought of as the primary security to the innocent against "hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will. [Cit.]" *Wood v. Georgia*, 370 U. S. 375, 390 (82 SC 1364, 8 LE2d 569) (1962). In the most recent case from the United States Supreme Court, the Court held that a subsequent conviction cannot cure the error of systematic racial exclusion in a grand jury. The court in *Vasquez* v. *Hillery*, 474 U. S. __ (106 SC 617, 88 LE2d 598) (54 USLW 4068, January 14, 1986) recognized that the discrimination could "impermissibly infect the framing of the indictment and, consequently, the nature or very existence of the proceedings to come." Id. at 4071. Either step in the process may have the effect of impermissibly infecting the framing of the indictment.

We cannot use judicial economy to chip away at the foundation of the protections our forefathers provided for us. Certainly it is expensive for counties to have to retry an accused, but in the long run it is far more expensive to errode our rights. After all, the protection of our individual rights is paramount to judicial economy.

There is a way we can have judicial economy and also protect our rights in future cases. We can require the trial courts to hold hearings after the first indictment, not the second as Justice Weltner suggests, to be certain that the grand jury was properly constituted. If the grand jury is found not to be so, it can be corrected at that time, prior to trial. If the grand jury is properly constituted, the hearing will foreclose future challenges to the array that involve many hours spent in the higher courts trying to determine whether or not the accused was denied any rights. This way we encourage counties to have proper grand juries, we protect our rights, and have judicial economy all at the same time.

"[T]he return of an indictment by the grand jury [is] a necessary prerequisite to the jurisdiction of the courts of this State to try a person charged with a felony. [Cits.]" *Roberson v. Balkcom*, 212 Ga. 603 (94 SE2d 720) (1956); *Nelms v. State*, 132 Ga. App. 689, 690 (209 SE2d 110) (1974), overruled on other grounds. A conviction is void

where there is no jurisdiction and we cannot breathe new life into a void conviction by remanding the case for a new indictment. The Court may not willy-nilly acknowledge or ignore the concept of jurisdiction upon personal whim.

WELTNER, Justice, concurring specially.

Although this is not a death penalty case, the guidelines of the Unified Appeal Procedure merit consideration: "Significant underrepresentation of white, blacks, men or women over the age of eighteen (18) years on either jury list shall be corrected prior to trial. Imbalances greater than five percent (5%) shall be considered significant." 252 Ga. at A-17. There is no evidence that the composition of the traverse jury list or Cochran's trial jury was similarly imbalanced. To the contrary, Cochran's jury included nine black jurors; six jurors were women. The disparity in this case presents this question: assuming that this imbalance was significant, was it harmful? While the majority holds that the disparity *in this case* is harmless, there is, nonetheless, a way in which we could make correction for significant disparities, short of reversing convictions, where there is no valid challenge to the traverse jury.

(a) Courts have corrected pre-trial deficiencies without vacating convictions on numerous occasions — including the United States Supreme Court. In *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964), the court found that the New York procedure for determining the voluntariness of a confession violated the defendant's due process rights because he was not given an adequate hearing on that issue during his trial. The court did *not* order a new trial, however, but remanded the case for a hearing on the issue. It observed: "It does not follow, however, that Jackson is automatically entitled to a complete new trial including a retrial of the issue of guilt or innocence . . . . [I]f . . . it is determined that Jackson's confession was voluntarily given . . . we see no constitutional necessity at that point for proceeding with a new trial, for Jackson has already been tried by a jury with the confession placed before it and has been found guilty . . . . Of course, if the state court, at an evidentiary hearing, redetermines the facts and decides that Jackson's confession was involuntary, there must be a new trial on guilt or innocence without the confession's being admitted in evidence." Id. at 394.

Recently, the United States Supreme Court employed the same procedure in *Waller v. Georgia*, 467 U. S. 39 (104 SC 2210, 81 LE2d 31) (1984). Finding that closing an entire hearing on a motion to suppress evidence violated the defendant's sixth amendment rights, the court did *not* order a new trial, as Waller requested, but ordered instead a new suppression hearing. The court went on to state: "[T]he remedy should be appropriate to the violation. If, after a new sup-

pression hearing, essentially the same evidence is suppressed, a new trial presumably would be a windfall for the defendant, and not in the public interest." Id. at 50.[1] (As to *sequelae*, see *Waller v. State*, 253 Ga. 146 (319 SE2d 11) (1984).)

(b) This court has designed remedies to correct pretrial error, *without* vacating convictions. We have remanded for Jackson-Denno hearings instead of reversing convictions. See, e.g., *Payne v. State*, 249 Ga. 354, 360 (7) (291 SE2d 226) (1982); *Hicks v. State*, 255 Ga. 503 (340 SE2d 604) (1986). Remand, rather than automatic reversal, has been ordered for *in camera* inspections by the trial court pursuant to Brady motions. *Tribble v. State*, 248 Ga. 274 (280 SE2d 352) (1981). In that case, the court explained: "Our holding in this case should not be construed as requiring *reversal* of a conviction solely on account of the trial court's failure to conduct an in camera inspection. Assuming material information has not been wrongfully withheld, 'this error . . . [generally] could be cured by post-trial examination . . . .'" Id. at 276. We have remanded to determine the merits of a Napue-Giglio claim, obviating the need for a new trial unless the defendant's claim proved well-grounded. *Smith v. Zant*, 250 Ga. 645 (301 SE2d 32) (1983).

In a different situation, we ordered the record on appeal supplemented to reflect what had actually transpired in the trial court. A defendant's contention that he was tried "in prison garb" was found to be without merit after the trial court found, in a subsequent hearing, that the clothing worn was not discernible as "prison garb," although it was prison property. *State v. Pike*, 253 Ga. 304 (320 SE2d 355) (1984).

The defendant in *Dunn v. State*, 251 Ga. 731 (309 SE2d 370) (1983), claimed that he was restricted improperly on voir dire from asking whether a venireman belonged to any fraternal organizations. The court handed down an opinion reversing the conviction, whereupon the state pointed out, on motion for rehearing, that the transcript filed with the appeal was incomplete. After the record was supplemented to show that the juror, in fact, had answered the question *before* the objection was made, Dunn's claim was rejected, and his conviction was affirmed.[2]

---

[1] See also *Morris v. Mathews*, 475 U. S. ___ (106 SC 1032, 89 LE2d 187) (54 USLW 4215, February 26, 1986). In that case, the court approved an appellate court's modification of a conviction for aggravated murder to a conviction for the lesser included offense of murder without ordering a new trial. The jury had found all the elements of murder. The appellate court barred the first conviction because it constituted double jeopardy. The defendant had been sentenced upon a plea of guilty to aggravated robbery. In a subsequent trial, he was convicted of aggravated murder, based on the same felony.

[2] See also our recent case of *Smith v. State*, 255 Ga. 654 (341 SE2d 5) (1986), in which we remanded for hearing and appropriate findings concerning the issue of ineffective assis-

(c) Our court has *not* considered the use of remand as a remedy for an unrepresentative grand jury list, nor has the United States Supreme Court. Recently, in *Vasquez v. Hillery*, 474 U. S. ___ (106 SC 617, 88 LE2d 598) (54 USLW 4068, January 14, 1986), the United States Supreme Court determined that systematic racial exclusion in the grand jury is not harmless error, but requires correction. The court further decided that the subsequent conviction cannot cure the error. "Thus, even if a grand jury's determination of probable cause is confirmed in hindsight by a conviction on the indicted offense, that confirmation in no way suggests that the discrimination did not impermissibly infect the framing of the indictment and, consequently, the nature or very existence of the proceedings to come." Id. at 4071.

The court rejected arguments that *no* correction is necessary because the error does not affect substantial rights of the accused at trial. This argument was first made by Justice Jackson in *Cassell v. Texas*, 339 U. S. 282 (70 SC 629, 94 LE 839) (1950): "This Court never has explained how discrimination in the selection of a grand jury, illegal though it be, has prejudiced a defendant whom a trial jury, chosen with no discrimination, has convicted." Id. at 301. See also Justice Stewart's concurring opinion in *Rose v. Mitchell*, 443 U. S. 545 (99 SC 2993, 61 LE2d 739) (1979): "The respondents were found guilty beyond a reasonable doubt after a fair and wholly constitutional jury trial. Why should such persons be entitled to have their convictions set aside on the ground that the grand jury that indicted them was improperly constituted? That question was asked more than 25 years ago by Mr. Justice Jackson in *Cassell v. Texas*. . . . It has never been answered. I think the time has come to acknowledge that Mr. Justice Jackson's question is unanswerable, and to hold that a defendant may not rely on a claim of grand jury discrimination to overturn an otherwise valid conviction." Id. at 574, 575.

The *Vasquez* court did not reach the issue of whether — assuming that an unrepresentative grand jury list is error which requires correction — remand for consideration of a possible reindictment is an appropriate corrective. The *Vasquez* court was concerned with the defendant's rights and not with the precise remedy to ensure those rights.[3] "The grand jury does not determine only that probable cause

---

tance of counsel, thus ensuring that the issue will be resolved at the earliest practicable moment.

[3] Compare *United States v. Mechanik*, ___ U. S. ___ (106 SC 938, 89 LE2d 50) (54 USLW 4167, February 25, 1986.) The court found that the simultaneous presence of two government witnesses at the grand jury proceeding violated Rule 6 (d) of the Federal Rules of Criminal Procedure, but constituted harmless error. A five-member majority of the court reasoned that "[t]hese societal costs of reversal and retrial are an acceptable and often necessary consequence when an error in the first proceeding has deprived a defendant of a fair determination of the issue of guilt or innocence. But the balance of interest tips decidedly

exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense — all on the basis of the same facts. Moreover, '(t)he grand jury is not bound to indict in every case where a conviction can be obtained.' " Id. at 4071. I suggest that the concerns addressed in *Vasquez* would be met fully by the remand remedy, without reversal of the conviction.

(d) Thus it will be seen that we would not be required to choose between reversing or affirming a defendant's conviction, as remand, as an alternative remedy, not only would be consistent with our past practices, as outlined, but a just solution.[4] We have stated too often to require citation that an accused is entitled to a fair trial, not a perfect one. It is not essential (indeed, it is subversive to justice) that a defendant should be accorded a new trial, with all its cost, delay and frustration, because of some deficiency — *unless* it has deprived him of a fair trial. In that regard, the remand concept has been healthy for criminal justice, bringing it closer to that reality which the public expects and demands from our judicial system.

(e) There still remains the necessity of assuring properly selected grand juries, and of eliminating the inherent evil of unrepresentative grand jury lists.

(1) This could be accomplished by remanding such a case to the trial court, with instructions that the bill of indictment be presented to a new and, of course, properly-selected grand jury. This, however, must be done under such circumstances as would ensure that the grand jury was not advised formally of the prior proceedings. The grand jury process, as presently structured, is not, perhaps, ideally fitted for the task which this court might now assign it. Grand jury

---

the other way when an error has had no effect on the outcome of the trial." Id. at 4169. The court distinguished its contrary holding in *Vasquez* on the basis of "precedent directly applicable to the special problem of racial discrimination," and because the alternative remedies considered — criminal prosecution or redress for excluded blacks — would be impractical. Id. at 4168, n. 1. Three additional members of the court who concurred in the judgment would have preferred a remedy of dismissing the indictment and obtaining a superseding one, whether before or after trial, when the grand jury's decision to indict has been influenced by the violation.

[4] See Saltzburg, *Pleas of Guilty and the Loss of Constitutional Rights: The Current Price of Pleading Guilty*, 76 Mich. L. Rev. 1265, 1289, n. 104 (1978): "If the Court wants to protect the defendant's right to an impartial grand jury, it could fashion a remedy that would not require unnecessary retrials: upon a finding that an indicting grand jury was improperly selected, a case would be sent to a new, properly constituted grand jury, which would not be told of the successful prosecution and which would redetermine whether an indictment should issue. Any objection that the later grand jury might be considerably different from the improperly selected one would fall in light of the fact that existing law allows a subsequent grand jury to reindict and a second trial to be held."

proceedings are secret; they are directed by a district attorney who is unfettered by the impartial supervision of the court, or the watchful eye of defense counsel; and there might come the temptation to inform the grand jury of the prior proceedings. Moreover, even if a district attorney scrupulously *attempted* to be fair, there is still no guarantee that he would succeed in avoiding the unwitting communication of subtle signals to the grand jury. (Nevertheless, re-indictment is a time-worn procedure, and certainly nothing novel.)

(2) The trial court, on remand, could, in conference with the district attorney and counsel for a defendant, devise a structure for the presentation of the bill of indictment to a properly-constituted grand jury, under such conditions as would, to the maximum degree possible, eliminate the intrusion of any pre-judgment by virtue of prior knowledge of the crime. This should include, as a minimum, the requirement that the proceeding be recorded and transcribed, by electronic or other means. Additionally, there should be a structure for the individual voir dire of grand jurors concerning possible knowledge of the case, and whether or not that knowledge, if any there be, might result in any inference adverse to the defendant. Further, if the grand jury should return a true bill of indictment, the court could convene a hearing promptly to inquire into the regularity of such bill, there to receive any motions on behalf of the defendant; and make findings of fact and conclusions of law relative to the constitutionality of the array and the validity of the proceedings.

(3) Should the grand jury fail to return a true bill of indictment charging the same offense with which a defendant has been convicted, then that conviction should be set aside. If the grand jury return a no bill, then the defendant should stand acquitted. If the grand jury return an indictment for a lesser included offense, then the conviction of the defendant should be set aside, and the case proceed to trial on the new indictment, charging such diminished crime.

If, however, a properly constituted grand jury should indict the defendant for the offense with which he has been convicted, then that reindictment would stand as the strongest possible proof that no miscarriage of justice had occurred, and the defendant should be entitled to *no* further relief by virtue of prior defective conditions in the grand jury.[5]

I am authorized to state that Justice Gregory joins in this special concurrence.

---

[5] Compare the history of the *Devier* case. Devier's conviction was vacated and a new trial ordered because of the underrepresentation of women on the grand jury list. *Devier v. State*, 250 Ga. 652 (300 SE2d 490) (1983). Devier was subsequently reindicted, retried, reconvicted, and resentenced to death. We affirmed. *Devier v. State*, 253 Ga. 604 (323 SE2d 150) (1984).

Decided June 16, 1986 —
Reconsideration denied July 2, 1986.

*Michael L. Bankston,* for appellant.

*J. Brown Moseley, District Attorney, Michael J. Bowers, Attorney General, J. Michael Davis, Assistant Attorney General,* for appellee.